**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

**OMIED BAGHERI and
OMBA IMPORT EXPORT INC.**

|  |  |
|---|---|
| **Plaintiffs,** | **File No.** |
|  | **COMPLAINT** |

         **-against-**

**NASIM SIDDIQI,
SABIH SIDDIQI,
ANCHOR FINANCE GROUP, LLC,
ANCHOR CAPITAL INTERNATIONAL, LLC**

         **Defendants.**
-----------------------------------------------------------------X

Plaintiffs, OMIED BAGHERI and OMBA IMPORT EXPORT INC. ("Plaintiffs" or "Plaintiff Bagheri") through their undersigned counsel, for their Complaint against Defendants NASIM SIDDIQI, SABIH SIDDIQI, ANCHOR CAPITAL INTERNATIONAL, LLC, and ANCHOR FINANCE GROUP, LLC ("Defendants") allege as follows:

## PARTIES

1.    The individual Plaintiff is a person that resides in the State of California.

2.    The corporate Plaintiff is a corporation that is duly incorporated under the laws of the State of California.

3.    Defendant NASIM SIDDIQI is a person that upon information and belief resides in Suffolk County, New York.

4.    Defendant SABIH SIDDIQI is a person that upon information and belief resides in Nassau County, New York.

5.    Defendant ANCHOR FINANCE GROUP, LLC is a limited liability company

that upon information and belief operates and is registered in the State of New York, with an operating address of: 105 Maxess Rd, Melville, NY 11803.

6.    Defendant ANCHOR CAPITAL INTERNATIONAL, LLC is a limited liability company that upon information and belief operates and is registered in the State of New York, with an operating address of: 105 Maxess Rd, Melville, NY 11803.

7.    Upon information and belief, Defendant NASIM SIDDIQI owns, operates, and controls both Defendant ANCHOR FINANCE GROUP, LLC and Defendant ANCHOR CAPITAL INTERNATIONAL, LLC.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this action under 28 U.S. Code § 1332.

9.    This Court has supplemental jurisdiction over state claims under the principles of pendent and ancillary jurisdiction.

10.    Venue is proper in this district under 28 U.S.C. § 1391(b)(c), because all or a substantial part of the events or omissions giving rise to the claims occurred herein.

## INTRODUCTION

11.    Plaintiffs are victims of a fraud and conspiracy by two individuals, primarily based in Nassau County, New York, who were preying on investors.

12.     The individual Defendants conspired to fraudulently induce Plaintiff to invest over $189,430 into a purported shipping project of medical-grade respirators that were intended to be procured inexpensively from an Eastern country, such as China, and shipped to the USA where it was widely known medical-grade respirators were in great demand at all times relevant herein. The shipping project developed by the individual Defendants (the

"Project"), in reality, is nothing more than a façade under which Defendants induced Plaintiffs participation by false "guarantees" among other material misrepresentations, then misused and squandered Plaintiff's investment funds to benefit themselves and their cohorts. Accordingly, as a result of the events described herein, Plaintiff unwittingly became one of any number of victims of personal protective equipment fraud ("PPE fraud") that was endemic in the U.S. at the height of the COVID-19 pandemic.

13.    While the individual Defendants marketed the Project to investors including the Plaintiff as a way they could quickly obtain a profit in exchange for investing money in a potentially lucrative business venture, in reality the investment has totally vanished due to Defendants' misrepresentations, material omissions, and pervasive negligence. As well, the representations made to induce Plaintiffs' investments into the Project were false and misleading, calculated to induce investments by trusting and unsuspecting investors.

14.    The Project was doomed from the start and was created for Defendants' sole self-interest and benefit in that the Project's only chance for success hinged on the importer's expertise including their ability to successfully navigate the unique regulatory constraints of completing such a project by understanding the nuances to shipping PPE in a climate of rampant PPE fraud, which entailed understanding the corruption, payment obligations, counterfeit products, and physical security threats prevalent in that part of the world.

15.    Defendants willfully failed to disclose this highly material information to investors including the Plaintiffs. Defendants knew that had they revealed this information as they are legally obligated to do, the investors would not have invested in the Project, and

would have demanded their investment funds back or requested that the investment funds be directed to a new and less risky project.

16.   The individual Defendants' self-interest in the Project was sole reason this information was not communicated and disclosed to the investors.

17.   As such, Defendants willfully did not disclose to investors that the Project was not headed by an experienced importer/exporter or logician at the helm, but by Defendants, who were also father and son, Nasim and Sabih Siddiqi, whose total shipping experience, had what would be considered paltry experience, and was clearly insufficient for a Project of this magnitude in a climate of rampant PPE fraud.

18.   Defendants' willful and contumacious conduct to induce and defraud investors was continuous and pervasive, and the misrepresentations communicated to Plaintiff were false and intentionally misleading. These statements included, but were not limited to that Defendants were highly experienced in shipping, sourcing, quality control, and compliance when they was clearly not for the reasons learned after February, 2021. Also that the transaction was 100% safe, legally "guaranteed," the shipment was "verified," and risk-free; and also an objectively false condition of Defendants' operations – when, in actuality, shipping of PPE actually represented an inherently corrupt, uncertain, ever-changing regulatory and tax climate, and in-depth knowledge of counterfeit products in a time PPE fraud was rampant – and that also required risk-analysis and particular expertise that the individual Defendants did not have.

**DEFENDANT SABIH SIDDIQI, ESQ.**

19.   Defendant Sabih Siddiqi, upon information and belief, is a resident of Nassau

Country, was at the helm of the Project and was the individual that induced and falsely represented the Project to the individual Plaintiff with the material misrepresentations as set forth below.

20.    To induce Plaintiffs to provide money to Siddiqi towards the Siddiqi business plan, Sabih Siddiqi represented to the individual Plaintiff the following, coinciding with the below dates:

a)   <u>An affirmative claim about the product's qualities, including an express warranty</u>. Specifically, that the transaction was "guaranteed" in terms of "production times, quality, and quantity" when in actuality the Defendants knew there was no legitimate guarantee of any kind and was therefore objectively false, such as in the email from Sabih Siddiqi to Plaintiff on May 29, 2020 that stated: "*we guarantee production times, quality, and quantity*". Plaintiffs would not have contracted with Defendants if they knew the professed warranty was not legitimate. Terms of the warranty purportedly included:

- Production times were guaranteed;

- Quality of product was guaranteed;

- Quantity of product was guaranteed.

- The specific terms further provided: *Warranty and Limited Remedy: Unless stated otherwise in 3M's product literature, packaging inserts or product packaging for individual products, 3M warrants that each 3M product meets the applicable 3M specifications at the time 3M ships the product. Individual products may have additional or different warranties as stated on product literature, package inserts or product packages.*  (page 1 of Defendants' certificate of conformity)

b) <u>The present condition of Defendants' finances and operations</u>. Defendants had represented "3M GLOBAL PRODUCTION" beneath their letterhead in a document with the letterhead, "Anchor Capital International, LLC", which was forwarded to Plaintiffs on or about May 7, 2020. However, Defendants operations did not include production, manufacture, or fabrication of materials in any capacity; as well, as a result of the said misbranding on the letterhead as "3M GLOBAL PRODUCTION", Defendants wrongfully capitalized on a falsely portrayed affiliation between themselves and 3M as a result of consumers' strong preference for 3M products and affiliates.  Plaintiffs would not have contracted with Defendants if they knew the true scope of their operations. Therefore, in addition to violation of the Deceptive and Unfair Trade Practices Act (GBL §§ 349 and 350), the present condition of Defendants' operations were thus misrepresented by the misbranding in order to materially mislead and overstate Defendants' position in the shipping industry, and induce trust to consummate the transaction.

c) <u>The present condition of Defendants' finances and operations.</u> Specifically, that the Defendants were "providing large quantities of PPE directly through our own manufacturers" when the Defendants did not have any of their "own manufacturers" as agents, servants and/or employees, or in any other capacity. Accordingly, this was a material misrepresentation in order to materially mislead and overstated Defendants' position in the shipping industry, and induce trust to consummate the transaction, as in the email from Sabih Siddiqi to Plaintiff on May 29, 2020 that stated:  "*we are providing large quantities of PPE directly through*

*our own manufacturers*"; and in the email of June 8, 2020 that stated: "*our own inventory*" when Defendants did not have any of their "own" inventory as well. The location of the email communication was County of Nassau, State of New York for Defendant; and the San Francisco Bay Area, State of California for Plaintiff.

d) <u>An affirmative claim about the product's qualities & the pretense of knowledge</u>. Specifically, that the Defendants represented that they have sold the specific products to "other hospitals" who "ran their own tests" on the masks and confirmed they are conforming, when the Defendants had factually not sold the products to other hospitals that had tested the products, but instead fabricated the story in order to induce reliance to consummate the transaction. The representations were made from Sabih Siddiqi to the individual Defendant via telephone communication on or about May 30, 2020. The location of the communication was County of Nassau, State of New York for Defendant; and the San Francisco Bay Area, State of California for Plaintiff.

e) <u>An affirmative claim about the product's qualities & the pretense of knowledge</u>. Specifically, that the Defendants represented the paper trail that they provided to Plaintiff was available as a certificate of conformity to refute any allegation of noncompliance – however, as the Defendants knew or were reckless in not knowing, the certificate of conformity could not, and ultimately did not refute the fact that the products were counterfeit. For this reason, it was thus purportedly given as a deceptive or manipulative device. The representations were made from Sabih Siddiqi to the individual Defendant via telephone communication on or

7

about May 30, 2020. The location of the communication was County of Nassau, State of New York for Defendant; and the San Francisco Bay Area, State of California for Plaintiff.

f) The present condition of Defendants' finances and operations & the pretense of knowledge. Specifically, that Sabih Siddiqi would safeguard the authenticity and integrity of the shipment, and the legality of the documents of the shipment by acting as an "agent" to the shipper; as well as by using vernacular in emails such that he would be "verify[ing]" and "reviewing" the transaction, thereby making the representation that he was qualified and experienced to verify the authenticity of the shipment from start to end, and detect non-compliant/counterfeit products when he was factually not qualified or had any relevant experience to do so in order to induce trust to consummate the transaction. The representations were made from Sabih Siddiqi to the individual Defendant via telephone communication on or about May 30, 2020 as well as email conversations on June 11, 2020. The location of the communication was County of Nassau, State of New York for Defendant; and the San Francisco Bay Area, State of California for Plaintiff.

g) The present condition of Defendants' finances and operations & the pretense of knowledge. Specifically, that the Defendants had arm's length contacts with licensed and trustworthy shipping brokers in the shipping region by using vernacular in emails such that: we "normally…" in order to materially misrepresent their experience for it to appear that the Defendants' experience included multiple successful transactions in order to induce trust to consummate

8

the transaction – when the true extent of his contacts were newly acquainted agents that he had never worked with previously, and who ultimately shipped worthless commodities that were counterfeit. The representations were made from Sabih Siddiqi to the individual Defendant via telephone communication on or about May 30, 2020 as well as email conversations on or about June 9, 2020. The location of the communication was County of Nassau, State of New York for Defendant; and the San Francisco Bay Area, State of California for Plaintiff.

h) The present condition of Defendants' finances and operations. That the Defendants specifically "verified" the FDA certification; and that Sabih Siddiqi and Nasim Siddiqi were highly experienced importer/exporters, and that they could also provide services relative to the sourcing, quality control, and compliance needed for successful shipping of personal protective equipment to the U.S., as in the emails from Sabih Siddiqi to Plaintiff set forth below, when in actuality the extent of Sabih Siddiqi's experience in international shipping, including sourcing, quality control, and compliance, was paltry. The location of the communication was County of Nassau, State of New York for Defendant; and the San Francisco Bay Area, State of California for Plaintiff.

i) That Sabih Siddiqi would "guarantee" the quality of the products in the context of being a licensed attorney, and thereby provide a false security net by virtue of an attorney's general fiduciary duty in order to safeguard the transaction for the Defendants. The location of the communication was County of Nassau, State of New York for Defendant; and the San Francisco Bay Area, State of California for Plaintiff.

9

As well, Defendant Nassim Siddiqi in line with Defendant Sabih Siddiqi's misrepresentations made the following misrepresentation:

j) <u>The pretense of knowledge</u>. Specifically, that the Shipper had 3M accreditation when Defendant Sabih Siddiqi knew or should have known the Shipper's 3M accreditation had expired at the time the transaction had occurred. In an email on January 8, 2021 from Nassim Siddiqi to Plaintiff, Siddiqi states: "*From our understanding, the distributor's re-authorization is being proce*ss*ed*" with the pretense of knowledge when there was no knowledge if the re-authorization was factually being processed or not. The location of the communication was County of Nassau, State of New York for Defendant; and the San Francisco Bay Area, State of California for Plaintiff.

**<u>DEFENDANT NASIM SIDDIQI:</u>**
**<u>OWNER AND OPERATOR OF DEFENDANT ANCHOR</u>**
**<u>CAPITAL INTERNATIONAL, LLC and DEFENDANT</u>**
**<u>ANCHOR FINANCE GROUP, LLC.</u>**

21.    Defendant Nasim Siddiqi ("Siddiqi"), also a resident of Nassau Country, purported to be Sabih Siddiqi's partner in the Project.

22.    The background of Defendant Siddiqi was that he was purportedly broadly experienced in the banking/international banking industry. Public information cites Defendant Siddiqi as holding positions as: a Global Bank of Commerce employee that is based in Antigua, N.A.; a past Sterling Trade Capital vice president and director of business development; and currently as the President of Anchor Capital Group, LLC, a Long Island-based international banking and investment strategy consulting company.

23.    Defendant Siddiqi's Linkedin page states: "[*He] is responsible for all aspects*

*of the firm's international banking, investment strategy, team, and operations across Anchor Group's affiliated global network. Nasim has worked and lived in Asia, the Caribbean, Central & South America, East Africa, and the United States. His working history is mirrored by the wide scope of his international banking, consumer & investment banking that stretch across multiple sectors and geographies.*" Defendant Siddiqi's Linkedin page further states he holds bachelor's degrees in banking & finance and that: "*he has done extensive work in the Islamic banking arena in North America and in the MENA region*."

24.    Siddiqi, whose expertise Plaintiff relied upon, and whose participation in the Project was a substantial factor in Plaintiffs' decision to invest in the project, had full knowledge of the perils of shipping given his background, and failed to disclose this information as he knew full well many investors including Plaintiff would pull out of the Project. As such, Siddiqi had committed a material omission of fact in that: 1) Siddiqi made the material omission not to disclose the inherent danger of shipping in a time of rampant PPE fraud; 2) and Siddiqi made the material omission not to disclose Defendant Sabih Siddiqi's gross inexperience in shipping, including sourcing, quality control, including detection of counterfeit products, and compliance. As well, in communications with the Plaintiff, Nasim Siddiqi also supplied the false pretense of knowledge whenever specifically asked about 1) and 2), as described herein.

## **TIMELINE FROM START TO END:**

25.    Upon information and belief, prior to January, 2021, Defendants Nasim Siddiqi and Sabih Siddiqi adopted a plan to purchase and distribute medical-grade  respirators (*i.e.* personal protective equipment or "respirators") that were manufactured in Asia, then shipped

11

to distributors in the United States ("Siddiqi business plan").

26.     Upon information and belief, however, Nasim Siddiqi and Sabih Siddiqi came to realize that the Siddiqi business plan was not a safe bet or a sure thing based on pervasive problems with corruption, payment obligations, currency risks, fraudulent products, and physical security threats in that area of the world.

27.   As well, importers from that part of the world must deal with bureaucratic minefields, as well as with the rampant PPE fraud. As a result, companies looking to enter the region must conduct a careful risk analysis. However, Nasim Siddiqi and Sabih Siddiqi also came to realize that the profit margin for a shipment from that part of the world would be very large if it safely arrived at its destination (*i.e.* big risk/big reward).

28.   Upon information and belief, Nasim Siddiqi and Sabih Siddiqi commenced logistically planning the business plan of a shipment from Asia, and that they would communicate their plan to (a) willing investor(s) who would be willing to invest the money to back the shipping of the crate of respirators in order to reap the reward of the respirators being sold in the United States for a large markup of their exported value, resulting in a large profit.

## SCHEME TO DEFRAUD

29.     Upon information and belief, and because Nasim Siddiqi and Sabih Siddiqi desired to invest as little of their own money as possible in the Siddiqi business plan, Nasim Siddiqi and Sabih Siddiqi developed a scheme to gain the confidence of an investor and induce him to unwittingly finance the Siddiqi plan by inducing the investor to provide Siddiqi money towards a purchase of the respirators inventory, wherein Nasim Siddiqi and Sabah Siddiqi

would take a cut of the investor's money, and also pay for the inventory of respirators with the rest without disclosing the risks of shipping (such as corruption, physical security threats, counterfeit products, etc. Hereinafter, "scheme to defraud"); and without disclosing to the investors that they should conduct a risk analysis, and also by inducing his participation by making false promises of "guarantees" and non-existent "verifications" that were actually fabrications.

30.     Upon information and belief, at all times relevant, Nasim Siddiqi and Sabih Siddiqi engaged in concerted actions to obtain the objectives of the scheme to defraud through deceit, misrepresentations of facts, omission of material facts, false confidence, and unfair dealing.

31.     Upon information and belief, at all times relevant, Sabih Siddiqi had the role individually and on behalf of Siddiqi of finding and cultivating an investor in the international import/export industry.

32.     Upon information and belief, and at all times relevant, Nasim Siddiqi and Sabih Siddiqi acted conspiratorially and as agents, both disclosed and undisclosed, with and for each other in furtherance of their scheme to defraud.

33.     As part of the scheme to defraud, and at all times relevant, Sabih Siddiqi falsely portrayed and represented himself as highly sophisticated in the international import/export industry and presented that he had substantial business relationships with many local and international commodity exporters, and industry leaders in the import/export market.

## **TARGET: OMIED BAGHERI**

34.     Upon information and belief, as part of their scheme to defraud, Nasim Siddiqi

and Sabih Siddiqi identified their first target investor as Plaintiff Omied Bagheri.

35.    Plaintiff Omied Bagheri is an investor from the State of California, who among other things, invests money in business ventures from time to time based, in part, upon representations made to him concerning the investment venture.

36.    Nasim Siddiqi and Sabih Siddiqi portrayed themselves as sophisticated in the importing/exporting industry.

37.    At some point before February, 2021, Nasim Siddiqi and Sabih Siddiqi, having now targeted Plaintiff Omied Bagheri, and knowing Plaintiff had money to invest, advanced their scheme to defraud whereby they would make false representations to Plaintiff to induce Plaintiff to provide money to Defendants under false pretenses.

38.    Nasim Siddiqi and Sabih Siddiqi's scheme was to present to Plaintiffs a false picture of themselves: 1) In an arm's length relationship with a number of trustworthy exporters and other agents in Asia, 2) to present Sabih Siddiqi as a highly experienced and reliable shipping, sourcing, quality control, and compliance professional, and then to portray the Siddiqi business plan as an legitimate and guaranteed investment opportunity for Plaintiff.

39.    The object of Defendants' plan was to induce Plaintiff to provide money to Defendants by offering Plaintiff an agreement for him to pay money that would result in a return on investment in the Siddiqi business plan.

40.    Upon information and belief, as part of their scheme to defraud, and in approximately February 2021, Nasim and Sabih Siddiqi attempted and succeeded to defraud Plaintiff into purportedly financing the purchase of the respirators.

41.     Upon information and belief, as part of their scheme, Defendants defrauded Plaintiff into providing a substantial sum of money through a constant pattern of fraud, deceit and misrepresentation, to induce Plaintiff without disclosing to him that Defendants had a secret business plan with each other.

42.     That Defendants never disclosed to Plaintiff that they were working in secret collaboration with each other and instead represented to Plaintiff that they were working as partners and agents with respect to the Project.

43.     To induce Plaintiffs to provide money to Defendants towards the Siddiqi business plan, Sabih Siddiqi represented to the individual Plaintiff the following, coinciding with the below dates. For all communications, The location of the communication was County of Nassau, State of New York for Defendant; and the San Francisco Bay Area, State of California for Plaintiff.

a.     In an email to the individual Plaintiff on May 29, 2020:

*I hope you are well.*

*3M Stock*

*Following up on our conversation, we are able to provide ready-made 3M 1860 masks at $3.80 and production stock under $2.00.  The 3M distributor is not open to cash on delivery terms but may do escrow on minimum orders of 1 million+ masks.*

*Other PPE*

*Just for your information, we are providing large quantities of PPE directly through our own manufacturers.  Unlike 3M transactions, we guarantee production times, quality, and quantity.  Kindly find attached our inventory list for your reference.*

*In particular, nitrile gloves (5mil, blue, powder-free) seem to be in short supply at a number of hospitals.  At this time, we have large allocations available.  The minimum order quantity is 50,000 boxes at $11.50 per box via sea freight.*

*Best regards, Sabih*

b.   In an email to the individual Plaintiff on June 8, 2020:

*Yes. We found a source last week for smaller orders under 1 million masks. We will have to reconfirm availability and price with that source. In our May 29 email to you we indicated that escrow may not work. However, depending on the quantity John Muir needs, our parent company may finance the transaction.*

*Kindly let us know the quantity. Also, do you need gloves, KN, N95 or 3ply masks? Those we can do through our own inventory and/or other ready allocations.*

*Best,*
*Sabih*

c.   In an email to the individual Plaintiff on June 9, 2020:

*The attached FDA registered N95 masks are available now at $3.75, inclusive of shipping. There are 300,000 of an original 2 million available and the supplier prefers to move the whole lot. We have reviewed their FDA qualifications and relevant guidance. These are "Non-NIOSH-Approved Disposable Filtering Facepiece Respirators" and seem to fall under the attached EUA from June 6, 2020. The EUA reissues the FDA's existing stance and approval of usage for such masks. If John Muir is interested, we will need to move soon.*

*Best,*
*Sabih*

d.   In an email to the individual Plaintiff on June 9, 2020:

*We normally aim to provide samples.*

*This is inhibited by the fact that these are in Las Vegas and not under our control, rather with a distributor.  In between receipt and testing, they will likely be sold.*

e.   In an email to the individual Plaintiff on June 11, 2020:

*We've communicated with a verified 3M distributor on 3M production stock.  Unfortunately, the minimum order quantity through them is at least 10 million.*

44.   That Nasim Siddiqi and Sabih Siddiqi knew that the Siddiqi business plan presented to Plaintiff was very risky, that their qualifications were tenuous, and that their

scheme to defraud involved taking Plaintiffs' money so as to be able to then execute a plan solely for the benefit of themselves.

## THE AGREEMENT BETWEEN THE PARTIES

45.   As a result of the Defendants' representations, Plaintiff arranged for 50,000 "3M 1860 N95" masks were delivered to the ultimate recipient, John Muir Hospital, located in the San Francisco Bay Area.

46.   The terms of the agreement negotiated between Plaintiff and Siddiqi (the "Siddiqi Agreement") included the following:

A) John Muir Hospital would issue a purchase order on 12/21/2020. (PO # 1116008) for 50,000 "3M 1860 N95" masks for the price of $189,430 that was directly induced by the Defendants' scheme to defraud in order to induce Plaintiff to provide money under the aforementioned false pretenses;

B)  As soon as Plaintiff received the purchase order, Plaintiff notified Kaano Trading Company, an intermediate agent in the transaction, and released $165,000 of Plaintiff's own funds to Kaano Trading Company with the instructions to forward the funds to the exporter that was directly induced by the Defendants' scheme to defraud in order to induce Plaintiff to provide money under the aforementioned false pretenses;

47.   The parties' agreement is clearly and unequivocally referable to the Siddiqi Agreement.

48.    Plaintiff's payment of $165,000 from his corporation towards purchase of the commodities, and the exporter's acceptance of that amount, is clearly and unequivocally referable to the Siddiqi Agreement.

49.    Upon information and belief, as a result of payment of the said $165,000, the product shipped from Seoul, Korea on or about December 24, 2020, and arrived in Los Angeles International Airport on or about December 27, 2020.

50.    No corporate documents other than a non-disclosure agreement were signed that memorialized the Siddiqi Agreement, thus each individual Defendant thus bound themselves individually.

## SPECIAL RELATIONSHIP OF TRUST

51.    At all relevant times herein, Nasim and Sabih Siddiqi, Defendants represented to Plaintiff that they had particular expertise in the preparation and compliance of shipping documents, and that the Project  at bar would not have any risks because they would conduct the transaction in such a manner that release of the respirators inventory would necessarily need to occur and be confirmed before the exporters would receive payment, thereby "safeguarding" the "guaranteed" transaction, akin to the fruition of escrow conditions in a residential real estate transaction before the payment of the property, or keys to the property would be released.

52.    At all relevant times herein, in Nasim and Sabih Siddiqi making the said representation to Plaintiff, Plaintiff made clear to Siddiqi that Plaintiff had a only a preliminary or "working" proficiency of legal shipping documents since he was not an

attorney, and that Plaintiff was entrusting Siddiqi to supply the relevant information and expertise.

53.    Sabih and Nasim Siddiqi, in turn, held themselves out to Plaintiff as having expertise and superior knowledge concerning shipping, sourcing, quality control, and compliance. Specifically, that Nasim Siddiqi he had decades of experience concerning the same in the context of international business transactions, as stated in his Linkedin web page. Sabih Siddiqi, in turn, held himself out to be a licensed attorney in New York State.

54.    Siddiqi was aware that Plaintiff was depending on Sabih and Nasim Siddiqi to accurately and prudently advise plaintiff concerning the legal documents, as well as the transaction as a whole.

55.    Accordingly, as a result of Nasim and Sabih Siddiqi's special expertise, a special relationship of trust justifiably existed between Nasim and Sabih Siddiqi and Plaintiff, which they were aware of because they supplied it for that purpose.

56.    Nasim Siddiqui's purported long-standing and close banking relationship with local and international banks, the known imbalance of information and expertise concerning the shipping documents between these parties, and the trust and confidence Plaintiff placed with Nasim and Sabih Siddiqi, and that Nasim and Sabih Siddiqi assumed to advise Plaintiff concerning the shipping documents and the transaction as a whole accordingly gave rise to a special relationship between Nasim and Sabih Siddiqui and Plaintiff at that point in time.

57.    As set forth above, in reliance upon Siddiqi's advice concerning the safety of the transaction, Plaintiff sent $165,000 to ship the documents for the promise that the

transaction was "guaranteed".

58.     Plaintiff reliance upon Nasim and Sabih Siddiqi included entrusting him to give them full authority to determine the specifics in regards to the legal documents that would ultimately be safeguarding the Project.

## COLLAPSE OF THE TRANSACTION

59.     On or about January 20, 2021, Plaintiff invoiced John Muir Hospital in the amount of $189,430.

60.     Shortly thereafter on or about February 5, 2021, an agent from John Muir Hospital disclosed to the individual Plaintiff that the entire shipment was examined and purported to trigger a warning that the shipment contained counterfeit respirators.

61.     Subsequently, it was learned the entire shipment was totally unusable as a result of counterfeit products, and was therefore worthless to John Muir Hospital or to anyone else.

62.     Accordingly, John Muir Hospital would not pay the invoice, and the individual Plaintiff was therefore left with a worthless product he had expended $165,000 of his own money as a result of Nasim and Sabih Siddiqi's false representations.

63.     On or about the same time, Nasim and Sabih Siddiqi cut off all contact with Plaintiff, and offered no explanation or recourse to recover Plaintiff's losses by way of the professed "guarantee." The "guarantee" thus turned out to be an apparent fabrication wherein defendant knowingly uttered the said falsehood, and that the plaintiff was thereby deceived and damaged as a result of relying on the falsehood.

64.     As a result of the foregoing, Plaintiff suffered a loss exceeding $189,430 as a

direct result of the totality of all of the Defendants' actions and omissions.

65.    The Plaintiff is wholly ignorant of the amounts of monies squandered and misused by Defendants in furtherance of their scheme to defraud. Accordingly, Plaintiffs herein are entitled to a sum of money of at least $189,430, as was Plaintiff's contribution to Defendants' scheme to defraud.

<u>**AS AND FOR A FIRST CAUSE OF ACTION AGAINST
ALL THE DEFENDANTS, PLAINTIFFS STATE
AND ALLEGE THE FOLLOWING:**</u>

<u>**(Fraud)**</u>

66.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

67.    The Defendants intentionally made the aforesaid misrepresentations of fact to Plaintiff.

68.    That the representations were made in furtherance of the scheme to defraud Plaintiffs.

69.    The misrepresentations of fact by the Defendants were known to be either false or made in reckless disregard of the truth by the Defendants at the time made.

70.    That the intent of the Defendants was to induce Plaintiffs' reliance upon the statements of fact and specifically to provide Defendants money for a particular purpose.

71.    Plaintiffs' reliance upon the misrepresentation by the Defendants was justifiable.

72.    Plaintiffs did not know, and had no reason to know, the misrepresentations about the Defendants operations, and the misrepresentations about the product, and they would not have proceeded with the transaction had they known.

73.    Plaintiffs suffered substantial harm by and as a result of the Defendants' actions false representations.

**AS AND FOR A SECOND CAUSE OF ACTION AGAINST
ALL THE DEFENDANTS, PLAINTIFFS STATE
AND ALLEGE THE FOLLOWING:**

**(Deceit)**

74.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

75.    Defendants made false affirmations to Plaintiffs.

76.    That the false affirmations were with the scienter and intent to defraud the Plaintiffs.

77.    Plaintiffs suffered damages as a result.

**AS AND FOR A  THIRD CAUSE OF ACTION AGAINST ALL THE
DEFENDANTS, PLAINTIFFS STATE AND
ALLEGE THE FOLLOWING:**

**(Money Had and Received)**

78.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if

hereinafter set forth in full.

79.    Defendants received money rightfully belonging to Plaintiffs.

80.    The Defendants benefited from the receipt of the money.

81.    Equity and good conscience dictate that the money cannot be kept by Defendants.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING:

### (Unjust Enrichment)

82.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

83.    Defendants have been enriched in the sum of their fees paid by Plaintiffs; the monies squandered, converted, and misused by Defendants.

84.    Defendants have benefited from Plaintiff's provision of monies with regard to amounts converted by Defendants and still in the possession of the Defendants.

85.    Defendants have been enriched at the expense of Plaintiffs.

86.    In equity and good conscious, Defendants cannot be permitted to retain Plaintiffs' money.

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING:

### (Negligent Misrepresentation Causing Harm)

23

87.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

88.    That Defendants were aware that their statements to Plaintiffs were to be used for a particular purpose by Plaintiffs.

89.    That the statements were made to Plaintiffs who has a relationship so close to Defendants as to approach that of privity.

90.    That Plaintiffs relied upon the Defendants on the statements.

91.    That Plaintiffs relied on the statements in furtherance of a purpose.

92.    Defendants engaged in conduct regarding the statement linking it to the Plaintiffs.

93.    That Defendants understood there is reliance upon the statement.

94.    That Plaintiffs have been damaged by the reliance.

## AS AND FOR A SIXTH CAUSE OF ACTION AGAINST ALL THE DEFENDANTS, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING:

### (Promise Causing Detrimental Reliance)

95.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

96.    Defendants made clear and unambiguous promises to Plaintiffs.

97.   There was reasonable and foreseeable reliance on the promise.

98.   That said reliance was by the Plaintiffs to whom the promise was made.

99.   That there was an injury sustained by Plaintiffs based upon the reliance on that promise.

## AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST ALL THE DEFENDANTS, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING:

### (Quasi Contract)

100.  Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

101.  Plaintiffs rendered performance to or on behalf of Defendants.

102.  That the performance was rendered at the request of Defendants.

103.  That the performance resulted in the Defendants' unjust enrichment.

## AS AND FOR AN EIGHTH CAUSE OF ACTION AGAINST ALL THE DEFENDANTS, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING:

### (Aiding and Abedding the Commission of a Tort)

104.  Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

105.  That there was evidence of a violation of Plaintiffs' rights by Defendants.

106.  That there was knowledge of the violation by the Defendants.

107.   That the Defendants substantially assisted the wrongdoing Defendants.

## AS AND FOR A NINTH CAUSE OF ACTION AGAINST ALL THE DEFENDANTS, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING:

### (Conspiracy)

108.   Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

109.   That Defendants engaged in the tort of fraud.

110.   That the torts were the product of a corrupt agreement among the Defendants.

111.   That there was an overt in furtherance of the agreement among the Defendants.

112.   That Defendants intentionally participated in furtherance of a plan or purpose.

113.   That the Plaintiffs sustained damages as a result.

## AS AND FOR A TENTH CAUSE OF ACTION AGAINST ALL THE DEFENDANTS, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING:

### (Breach of Contract)

114.   Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

115.   Plaintiffs advanced Defendants money pursuant to particular terms in which they agreed to provide $189,430.

116. Defendants failed to provide a conforming shipment.

117. Pursuant to the particular terms, Defendants failed to provide reimbursement in accordance with a professed guarantee.

118. Accordingly, Plaintiff sustained damages as a result.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION AGAINST ALL THE DEFENDANTS, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING

### (*In the alternative* Negligence/Gross negligence)

119. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

120. Defendants owed Plaintiffs a duty of care.

121. Defendants breached that duty by acting recklessly or negligently.

122. Defendants' reckless acts and omissions directly caused Plaintiff damages.

123. Defendants' damages were reasonably foreseeable to the reasonably prudent person.

## AS AND FOR AN TWELVETH CAUSE OF ACTION AGAINST ALL THE DEFENDANTS, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING

### (Breach of Express Warranty)

124. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

125.  Defendants made a material statement amounting to a warranty in the transaction according to specific terms, as set forth herein.

126.  Plaintiffs relied on this warranty as to the quality of the products as a basis for the contract with the Defendants.

127.  Defendants breached of the warranty by failing to reimburse the Plaintiffs of their investment upon request when it was learned the products were non-conforming, and therefore worthless.

128.  Plaintiffs were injured in the amount aforementioned that was caused by Defendants' breach of express warranty.

### AS AND FOR AN THIRTEENTH CAUSE OF ACTION AGAINST ALL THE DEFENDANTS, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING

### (Breach of Fiduciary Duty)

129.  Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

130.  Plaintiff contracted with Defendant Sabih Siddiqi towards a business venture as aforesaid.

131.  During the transaction, Defendant Sabih Siddiqi represented he was a licensed attorney in the context of providing legal advice and legal documents for the transaction in exchange for consideration that would be a share of the business venture profits.

132.  During the course of the transaction, Plaintiff discussed his needs and

specifications for this project that necessarily involved legal advice and instruction from Defendant Sabih Siddiqi.

133.   At no point did Defendant Sabih Siddiqi provide a written or verbal disclaimer that he did not intend to enter an attorney/client relationship between Plaintiffs and defendant Sabih Siddiqi.

134.   At no point did Plaintiff execute a written disclaimer that Defendant Sabih Siddiqi did not intend to enter an attorney/client relationship between Plaintiff and Defendant Sabih Siddiqi.

135.  A fiduciary relationship between the plaintiff and the defendant was established via an attorney/client relationship between Plaintiff and Defendant Sabih Siddiqi as a result of providing the legal advice and instruction, as well as legal documents for the transaction.

136.  Defendant Sabih Siddiqi committed misconduct as described herein in furtherance of a scheme to defraud, as well as a conspiracy to commit fraud as described herein.

137.   Plaintiff suffered damages as described herein as a result of the misconduct as a direct result of the aforementioned fraud, as well as the failure to honor the professed guarantee in the context of providing legal advice, which is actionable in the State of New York as breach of fiduciary duty.

### AS AND FOR A FOURTEENTH CAUSE OF ACTION AGAINST ALL THE DEFENDANTS, PLAINTIFFS STATE AND ALLEGE THE FOLLOWING

### (Violation of General Business Law §§ 349 and 350)

138.   Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in paragraphs of this complaint hereinabove, inclusive with the same force and effect as if hereinafter set forth in full.

139.   Defendants had represented "3M GLOBAL PRODUCTION" beneath their letterhead in a document with the letterhead, "Anchor Capital International, LLC", which was forwarded to Plaintiffs on or about May 7, 2020.

140.   "3M GLOBAL PRODUCTION" is misleading because the product does in Defendants operations did not include "production", manufacture, or fabrication of materials in any capacity, nor are the Defendants contracted with 3M corporation in any legal capacity other than the Defendants had purportedly sought to import 3M products.

141.   The letterhead was provided to Plaintiffs on May 7, 2020, and upon information and belief, to other consumers in general that the defendants sought to contract with at all relevant times herein.

142.   By marketing the Product as "3M GLOBAL PRODUCTION", Defendants wrongfully capitalized on and reaped profits from consumers' strong preference for 3M products, such as PPE.

143.   Plaintiffs and anyone else transacting with Defendants reasonably relied on Defendants' representations that the Defendants' customarily contract with 3M, and also manufacture 3M products.

144.   Defendants' "3M GLOBAL PRODUCTION" misrepresentation would deceive a reasonable consumer.

145.   At the point of contract, Plaintiffs did not know, and had no reason to know, that the product is misbranded as set forth herein, and would not have contracted to buy the product had they known the truth about it

146.   This aforementioned conduct would thus constitute an "inherently deceptive" transaction, as well as patently false advertising in violation of GBL §§ 349 and 350.

147.   Defendants would not have included the representation on the letterhead if it was not going to influence consumer behavior.

148.   Defendants has a natural interest in misrepresenting its' products as "3M GLOBAL PRODUCTION". The Product's misrepresentation provides a clear marketing advantage over competitors that do not engage in such deceptive conduct.

149.   Plaintiffs were injured by relying on the said misbranding as set forth herein.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff respectfully requests this Court to enter judgment in his favor and against Defendants as follows:

1.   Awarding Plaintiffs on the claims herein as determined by this honorable Court, but not less than $189,430.

2.   Awarding Plaintiffs punitive and consequential damages on the claims herein as determined by this honorable Court.

3.   Granting such other and further relief as the Court deems just and proper, including the costs of this action.

Dated: November 16, 2023

Christopher Rykaczewski, Esq.
*Attorney for Plaintiffs*
97-77 Queens Boulevard, 9th Floor
Rego Park, NY 11374
P: 201-953-4450; F: 718-897-5667
*Regoparkattorney@gmail.com*