UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

For Online Publication Only

----------------------------------------------------------------------X

OMIED BAGHERI and OMBA IMPORT EXPORT INC.,

Plaintiffs,

-against-

**MEMORANDUM & ORDER**
23-cv-08593 (JMA) (ST)

NASIM SIDDIQI, SABIH SIDDIQI, ANCHOR FINANCE GROUP, LLC, AND ANCHOR CAPITAL INTERNATIONAL, LLC,

Defendants.

----------------------------------------------------------------------X

FILED
CLERK
9/9/2026 12:38 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**AZRACK, United States District Judge:**

Plaintiffs Omied Bagheri and OMBA Import Export Inc. ("OMBA") bring this action against Defendants Nasim Siddiqi, Sabih Siddiqi, Anchor Finance Group, LLC, and Anchor Capital International, LLC. (ECF No. 1.) Plaintiffs allege that Defendants fraudulently induced them to invest in a business plan to procure and import medical-grade respirators that turned out to be counterfeit. Before the Court is Defendants' motion to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). For the reasons that follow, the motion is GRANTED.

## I. BACKGROUND

### A. Relevant Facts

The facts alleged in the Complaint are as follows.

At some point in mid- to late-2020, Defendants proposed a business idea to Plaintiffs concerning the import of personal protective equipment ("PPE") to the United States. (ECF No. 1 ¶¶ 12, 25.) Bagheri, an investor from California, alleges that he was "targeted" by Nasim and Sabih Siddiqi, a father-son duo from New York who "portrayed themselves as sophisticated in the

importing/exporting industry." (Id. ¶¶ 2–3, 17, 35–37.) The goal of the proposal was to procure inexpensive medical-grade respirators from "an Eastern country, such as China" and ship them to the United States, "where it was widely known medical-grade respirators were in great demand" at the time due to the Coronavirus pandemic. (Id. ¶ 12.) Bagheri was attracted to this opportunity to "quickly obtain a profit in exchange for investing money in a potentially lucrative business venture." (Id. ¶ 13.)

Six months after his communications with Defendants, Bagheri spent $165,000 to import masks from a third-party distributor and attempted to sell those masks at a profit to John Muir Hospital in San Francisco, California. (Id. ¶¶ 59–65.) Upon inspection, John Muir Hospital determined that the masks were counterfeit and refused to accept or pay for them. (Id.)

Bagheri blames Defendants for this failed deal, alleging that they fraudulently induced him to invest in PPE "during a climate of rampant PPE fraud." (Id. ¶ 17). He alleges that Defendants, whom he understood to be sophisticated importers, in fact had only "paltry" shipping experience that was "clearly insufficient for a Project of this magnitude[.]" (Id. ¶ 17.) Somewhat contradictorily, Bagheri also alleges that Nasim Siddiqi had sufficient "expertise" in international business deals to have "full knowledge of the perils of shipping," yet failed to disclose "the inherent danger of shipping" to Plaintiffs or to "disclos[e] to investors that they should conduct a risk analysis." (Id. ¶¶ 24, 29; see also id. ¶ 23 (quoting Nasim Siddiqi's LinkedIn page, which allegedly states that he has experience in international banking and investment strategy across "multiple sectors and geographies").) Bagheri also alleges that Sabih Siddiqi "held himself out to be a licensed attorney in New York State," (id. ¶ 53), which provided Bagheri with the impression of "a false security net by virtue of an attorney's general fiduciary duty[,]" (id. ¶ 20).

The Complaint includes few details about Defendants' alleged fraud. As set out below, Plaintiffs quote several alleged misrepresentations by Defendants and give a brief overview of the

unsuccessful PPE deal. However, the Complaint leaves several gaping holes in the story. Most notably, the Complaint never alleges that Defendants had any role in the particular deal that led to this lawsuit.

**1. The business proposal**

Plaintiffs allege that Defendants fraudulently induced them to invest in a PPE shipment through the following communications. (See id. ¶ 14.) The Complaint does not explain when the parties first began to communicate, or who first approached whom.

On May 7, 2020, Defendants forwarded to Bagheri a document with "3M GLOBAL PRODUCTION" written under the letterhead "Anchor Capital International, LLC." (Id. ¶ 20.) Plaintiffs allege that Defendants intended to portray a "false" affiliation between themselves and "3M" because consumers have a "strong preference for 3M products and affiliates."[1] (Id. ¶ 20.) The Complaint contains no other information about this document or its contents.

On May 29, 2020, Sabih Siddiqi emailed Bagheri regarding two categories of PPE available for purchase and the types of deals available in each category. He wrote:

> 3M Stock: Following up on our conversation, we are able to provide ready-made 3M 1860 masks at $3.80 and production stock under $2.00. The 3M distributor is not open to cash on delivery terms but may do escrow on minimum orders of 1 million+ masks.
>
> Other PPE: Just for your information, we are providing large quantities of PPE directly through our own manufacturers. Unlike 3M transactions, we guarantee production times, quality, and quantity. Kindly find attached our inventory list for your reference. In particular, nitrile gloves (5mil, blue, powder-free) seem to be in short supply at a number of hospitals. At this time, we have large allocations available. The minimum order quantity is 50,000 boxes at $11.50 per box via sea freight.

(Id. ¶ 43.) The Complaint does not include any excerpts from Bagheri's side of the conversation.

[1] The Complaint never explains what "3M" means or why consumers prefer it. The Court infers from context that it is a trusted brand of PPE.

On May 30, 2020, Sabih Siddiqi allegedly told Bagheri via telephone call that Defendants had "sold the specific products to 'other hospitals' who 'ran their own tests' on the masks and confirmed they are conforming[.]" (Id. ¶ 20.) The Complaint does not state which "specific products" were discussed on that phone call or to what standards Defendants allegedly promised they would "conform."

On June 8, 2020, Sabih Siddiqi emailed Bagheri as follows:

> Yes. We found a source last week for smaller orders under 1 million masks. We will have to reconfirm availability and price with that source. In our May 29 email to you we indicated that escrow may not work. However, depending on the quantity John Muir needs, our parent company may finance the transaction.
>
> Kindly let us know the quantity. Also, do you need gloves, KN, N95 or 3ply masks? Those we can do through our own inventory and/or other ready allocations.

(Id. ¶ 43.) Again, the Complaint does not include Plaintiffs' side of this conversation, so it is not clear what type of product or "source" Plaintiffs had inquired about, nor how John Muir came into the conversation. The Complaint does not include any other mention of Defendants' "parent company."

On June 9, 2020, Sabih Siddiqi emailed Bagheri as follows:

> The attached FDA registered N95 masks are available now at $3.75, inclusive of shipping. There are 300,000 of an original 2 million available and the supplier prefers to move the whole lot. We have reviewed their FDA qualifications and relevant guidance. These are "Non-NIOSH-Approved Disposable Filtering Facepiece Respirators" and seem to fall under the attached EUA from June 6, 2020. The EUA reissues the FDA's existing stance and approval of usage for such masks. If John Muir is interested, we will need to move soon.

(Id. ¶ 43.) Later on June 9, Sabih Siddiqi emailed Bagheri, saying:

> We normally aim to provide samples. This is inhibited by the fact that these are in Las Vegas and not under our control, rather with a distributor. In between receipt and testing, they will likely be sold.

(Id.) The Complaint does not quote Plaintiff's side of the conversation or include any additional information about the masks discussed in these emails. The referenced "attachment" is not

included or further described in the Complaint. It is unclear whether these masks are the same as the ones discussed in the June 8 email quoted above, or an alternative investment option.

On June 11, 2020, a Defendant (the Complaint does not specify which one) emailed Bagheri:

> We've communicated with a verified 3M distributor on 3M production stock. Unfortunately, the minimum order quantity through them is at least 10 million.

(Id.) The Complaint does not include any other information about the identity of this "verified 3M distributor" or the parties' discussion of this investment option.

**2. The failed business deal**

Six months later, Plaintiffs entered a deal allegedly "negotiated between Plaintiff and Siddiqi." (Id. ¶¶ 13, 46.) The Complaint refers to the deal as the "Siddiqi Agreement," but does not specify whether the deal was negotiated by Sabih Siddiqi, Nasim Siddiqi, or both. (Id. ¶ 46.) "No corporate documents other than a non-disclosure agreement were signed that memorialized the Siddiqi Agreement[.]" (Id. ¶ 50.) The Complaint does not include any information about this alleged non-disclosure agreement. The alleged deal played out as follows.

On December 21, 2020, John Muir Hospital in San Francsico, California issued a purchase order for 50,000 "3M 1860 N95" masks for the price of $189,430. (Id. ¶ 46.) It is unclear to whom John Muir issued the purchase order, or whether these masks are the same ones referenced in any of the above-quoted emails between the parties. Bagheri then "released $165,000 of Plaintiff's own funds to Kaano Trading Company with the instructions to forward the funds to the exporter[.]" (Id.) The Complaint states that Kaano Trading Company was "an intermediate agent in the transaction" but does not provide any other information about that entity, such as who controls it, where it is located, or whether it has any relationship to the Defendants in this action. The Complaint does not allege any information about "the exporter" who was the intended recipient of

Plaintiff's $165,000. The Complaint does not allege that Defendants received any of the money Plaintiffs paid to Kaano Trading Company.

The product shipped from Seoul, South Korea on or about December 24, 2020 and arrived in Los Angeles on or about December 27, 2020. (Id. ¶ 49.)

On January 8, 2021, Nasim Siddiqi allegedly told Plaintiffs: "From our understanding, the distributor's [3M] re-authorization is being processed[.]" (Id. ¶ 20.) The Complaint provides no other information or context about the January 8 communication, such as which distributor Siddiqi referred to, what 3M authorization is or why Bagheri was inquiring about it, for how long the distributor's authorization had been in doubt, or what connection, if any, this communication had to the Kaano Trading Company deal. Other than this one sentence, the Complaint does not describe any communication between the parties after June 11, 2020.

On or about January 20, 2021, Plaintiffs invoiced John Muir Hospital in the amount of $189,430. (Id. ¶ 59.) However, on or about February 5, 2021, John Muir Hospital informed Plaintiffs that the shipment was unusable because it contained counterfeit products. (Id. ¶¶ 60–61.) Accordingly, John Muir Hospital refused to pay Plaintiffs for the shipment. (Id. ¶ 62.) Around this time, Defendants allegedly "cut off all contact with Plaintiff[.]" (Id. ¶ 63.)

**B. Procedural History**

Plaintiffs initiated this action by filing the Complaint on November 17, 2023, (ECF No. 1), and effecting service on May 2, 2024, (ECF Nos. 20–23). The Complaint invokes fourteen causes of action: (1) fraudulent inducement, (2) deceit, (3) money had and received, (4) unjust enrichment, (5) negligent misrepresentation, (6) promissory estoppel, (7) quasi contract, (8) aiding and abetting the commission of a tort, (9) civil conspiracy to commit fraud, (10) breach of contract, (11) negligence/gross negligence, (12) breach of express warranty, (13) breach of fiduciary duty, and (14) violation of N.Y. General Business Law §§ 349 and 350.

Discovery closed on September 2, 2025. (ECF No. 55.) On December 17, 2025, Defendants filed the instant motion to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). (ECF No. 58-1; see also ECF Nos. 58-2, 58-3.)

## II. LEGAL STANDARD

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Allco Fin. Ltd. v. Klee, 861 F.3d 82, 94–95 (2d Cir. 2017) (quoting Iqbal, 556 U.S. at 678). "Although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (cleaned up); see also Rolon v. Henneman, 517 F.3d 140, 149 (2d Cir. 2008) (explaining that a court need not accept "conclusory allegations or legal conclusions masquerading as factual conclusions").

Plaintiffs alleging fraud claims face additional, heightened pleading requirements beyond those enumerated above. Federal Rule of Civil Procedure Rule 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances constituting [the] fraud." Fed. R. Civ. P. 9(b). In order to survive a motion to dismiss under Rule 9(b), the plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent[.]" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,, 493 F.3d 87, 99 (2d Cir. 2007). While Rule 9(b) demands specificity as to the circumstances of an alleged fraud, it allows a plaintiff to "allege[] generally" any requisite state of mind, such as "[m]alice, intent, [or] knowledge[.]" Fed. R. Civ. P. 9(b).

# III. DISCUSSION

## A. Contract Claims (Counts 10, 12)

Plaintiff's claim for breach of contract (Count 10) states that Defendants "failed to provide reimbursement in accordance with a professed guarantee." (ECF No. 1 ¶¶ 114–18.) Similarly, Plaintiff's claim for breach of express warranty (Count 12) states that "Defendants made a material statement amounting to a warranty" and that "Defendants breached of [sic] the warranty by failing to reimburse the Plaintiffs of their investment upon request when it was learned the products were non-conforming[.]" (Id. ¶¶ 124–28.) As explained further below, these claims are both meritless because the Complaint does not sufficiently allege that Defendants made any promises whatsoever to Plaintiffs regarding the deal with Kaano Trading Company and John Muir Hospital that is the basis of this lawsuit.

To state a claim for breach of contract under New York law, a plaintiff must plead the following elements: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Piuggi v. Good for You Prods. LLC, 739 F. Supp. 3d 143, 167 (S.D.N.Y. 2024) (quoting Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 188–89 (S.D.N.Y. 2011). "To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound[.]" Assure Glob., LLC v. Anderson, 763 F. Supp. 3d 476, 484 (S.D.N.Y. 2025) (quoting Zhu Jun v. Bank of Am., N.A., 2024 WL 5135381, at *7 (2d Cir. Dec. 17, 2024)).

To state a claim for breach of an express warranty under New York law, a plaintiff must plead the following elements: "(i) a material statement amounting to a warranty; (ii) the buyer's reliance on this warranty as a basis for the contract with his immediate seller; (iii) the breach of this warranty; and (iv) injury to the buyer caused by the breach." Lieber v. Igloo Prods. Corp.,

824 F. Supp. 3d 283, 296 (E.D.N.Y. 2026) (quoting Avola v. Louisiana-P. Corp., 991 F. Supp. 2d 381, 391 (E.D.N.Y. 2013)). An express warranty is an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain[.]" N.Y. U.C.C. § 2–313(1)(a).

Counts 10 and 12 fail because the Complaint does not allege the existence of any agreement between the parties or any material statement amounting to a warranty in connection with the Kaano Trading Company deal. The most that can be understood from the Complaint is that Defendants proposed a variety of PPE investment opportunities to Plaintiffs in May and June of 2020 and that, six months later, Plaintiffs lost money after purchasing a shipment of counterfeit respirators from Kaano Trading Company. The Complaint concedes that no agreement between the parties was ever memorialized in writing. (ECF No. 1 ¶ 50.) The Complaint also does not sufficiently allege any enforceable unwritten agreement. For example, the Complaint does not allege that Defendants requested, were promised, or received money or any other benefit from Plaintiffs at any point, let alone in connection with the Kaano Trading Company deal. The Complaint does not allege any relationship between Defendants and the recipients of Plaintiffs' money: Kaano Trading Company and the Korean exporter. Although the Complaint alleges that the deal was "negotiated between Plaintiff and Siddiqi," it does not describe what that alleged negotiation entailed or what role, if any, Defendants played in the deal once Plaintiffs were brought on board. The Complaint does not even say whether this deal was one of the investment opportunities discussed in the May and June emails. And if it was, the only statement in those emails that even vaguely resembles a "guarantee" or a "warranty" is Sabih Siddiqi's statement on May 29 that, "[u]nlike 3M transactions, we guarantee production times, quality, and quantity" for products procured from "our own manufacturers." (Id. ¶ 43.) This statement expressly excludes "3M transactions," (id.), whereas John Muir Hospital specifically ordered 50,000 "3M 1860 N95"

masks. (Id. ¶ 46.) Therefore, the Complaint does not describe any contract or warranty agreed to by Defendants with respect to the masks Plaintiffs purchased from Kaano Trading Company and attempted to sell to John Muir Hospital.

Accordingly, Plaintiffs' breach of contract and breach of express warranty claims are dismissed for failure to plead the existence of an enforceable promise or warranty.

**B. Quasi-Contract Claims (Counts 3, 4, 6, 7)**

Plaintiffs' claim for money had and received (Count 3) states that "Defendants received money rightfully belonging to Plaintiffs" and that "equity and good conscience dictate that the money cannot be kept by Defendants." (ECF No. 1 ¶¶ 80–81.) Plaintiffs' unjust enrichment claim (Count 4) states that "Defendants have been enriched in the sum of their fees paid by Plaintiffs; the monies squandered, converted, and misused by Defendants." (Id. ¶¶ 83–84.) Plaintiffs' quasi-contract claim (Count 7) is duplicative of their unjust enrichment claim, stating that "Plaintiffs rendered performance to or on behalf of Defendants" and that "the performance resulted in the Defendants' unjust enrichment." (Id. ¶¶ 101–03.)

Counts 3, 4, and 7 all fail for the simple reason that the Complaint does not allege that Defendants received any money or other benefit of any kind from Plaintiffs. Bagheri is suing over the $165,000 he paid to Kaano Trading Company, "with instructions to forward the funds to the exporter," and $24,430 in lost expected profits. (ECF No. 1 ¶ 46.) The Complaint does not allege any relationship between Defendants and the entities who received Plaintiffs' money and does not allege that Defendants received any portion of that money, were paid a fee by Plaintiffs, or were enriched by Plaintiffs in any other way. See Cohen v. Dunne, No. 15-cv-3155, 2017 WL 4516820, at *4 (S.D.N.Y. Sept. 27, 2017) (explaining that, under New York law, it is a necessary element of the quasi-contract claim for unjust enrichment that "the other party was enriched") (citing Ga. Malone & Co., Inc., v. Rieder, 19 N.Y.3d 511, 516 (N.Y. 2012)); id. at *5 (stating the elements

for "money had and received," the first of which is that "the defendant received money belonging to the plaintiff") (quoting Lebovits v. Bassman, 120 A.D.3d 1198, 1199 (N.Y. App. Div. 2d Dep't 2014)).

Plaintiffs' promissory estoppel claim (Count 6) states in a conclusory fashion that "Defendants made clear and unambiguous promises to Plaintiffs," that Plaintiffs reasonably and foreseeably relied on those promises, and that Plaintiffs suffered damages as a result. (ECF No. 1 ¶¶ 96–99.)

This claim fails for much the same reasons as Plaintiffs' contract claims, discussed supra. "Although a form of quasi-contract, promissory estoppel differs from quantum meruit and unjust enrichment in that it turns not on the nature of the benefit received by the defendant but upon the clarity and definitiveness of its promise and change in the plaintiff's position as a result of that promise." Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC, 680 F. Supp. 3d 322, 342 (S.D.N.Y. 2023). Under New York law, "[a] promise that is too vague or too indefinite is not actionable under a theory of promissory estoppel." Lamda Sols. Corp. v. HSBC Bank USA, N.A., 574 F. Supp. 3d 205, 215 (S.D.N.Y. 2021) (quoting Bd. of Trustees ex rel. Gen. Ret. Sys. of Detroit v. BNY Mellon, N.A., No. 11-cv-6345, 2012 WL 3930112, at *6 (S.D.N.Y. Sept. 10, 2012)). Here, the Complaint does not allege that Plaintiffs reasonably relied on any definite promise made by Defendants. As discussed above, the Complaint does not draw any connection between the representations made by Defendants about various investment opportunities and the Plaintiffs' deal with Kaano Trading Company.

Accordingly, the Court dismisses Plaintiffs' quasi-contract claims.

### C. Fraud Claims (Counts 1, 2, 8, 9)

Counts 1 and 2 allege fraud and deceit under New York common law. (See ECF No. 1 ¶¶ 66–77.) "To state a claim for fraud under New York law, a plaintiff must allege (1) a material

misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC, 783 F.3d 395, 402 (2d Cir. 2015); AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 208 (2d Cir. 2000) (treating "fraud and deceit" as one claim). "When a plaintiff's claim is based on a fraudulent omission of a material fact, rather than a materially false statement, . . . 'there must be a showing that there was a fiduciary or confidential relationship between the parties that would impose a duty to disclose material information.'" Dale v. L'Oreal USA, Inc., No. 22-cv-00427, 2023 WL 3984345, at *7 (E.D.N.Y. June 13, 2023) (quoting Cantor v. Villucci, 181 N.Y.S.3d 644, 646 (N.Y. App. Div. 2d Dep't 2023).

Plaintiffs' fraud claims fail on multiple fronts. The Complaint alleges that Defendants made several "false" statements, but Plaintiffs never explain how they know that these statements were "false" or how the statements were material to Plaintiffs' deal with Kaano Trading Company. For example, Plaintiffs state that Defendants represented that they "were highly experienced in shipping, sourcing, quality control, and compliance when they was [sic] clearly not for the reasons learned after February, 2021." (ECF No. 1 ¶ 18; see also ECF No. 58-2 at 9.) But the Complaint says absolutely nothing about the substance of these "reasons learned after February, 2021." Additionally, the only specific allegation in the Complaint about the Defendants' representations regarding their professional experience is a quote from Nasim Siddiqi's LinkedIn Page, which refers to "the wide scope of his international banking, consumer & investment banking that stretch across multiple sectors and geographies" and states that "he has done extensive work in the Islamic banking arena in North America and in the MENA region." (ECF No. 1 ¶ 23.) Plaintiffs never explain how this representation is false or how it gave Plaintiffs the impression that the Defendants were "were highly experienced in shipping, sourcing, quality control, and compliance," (id. ¶ 18),

as the quoted portion of the LinkedIn page doesn't mention any of these subjects. Next, Plaintiffs allege that it was a misrepresentation for Defendants to state in their May 29, 2020 email that they could "provid[e] large quantities of PPE directly through our own manufacturers" because Defendants "did not have any of their 'own manufacturers' as agents, servants and/or employees, or in any other capacity." (ECF No. 1 ¶ 20; see also ECF No. 58-2 at 8.) Again, Plaintiffs do not explain what they understood Defendants to mean by the phrase "our own manufacturers," how they learned Defendants do not actually have such manufacturers, or how this representation could possibly have been material to the Kaano Trading Deal, which involved only "3M" masks. (See ECF No. 1 ¶ 43 (presenting 3M products and products from Defendants' "own manufacturers" as alternative investment opportunities).) Plaintiffs also argue that Defendants fraudulently presented "the Siddiqi business plan as an [sic] legitimate and guaranteed investment opportunity for Plaintiff[.]" (ECF No. 58-2 at 9.) However, the Complaint never squarely alleges what "the Siddiqi business plan" refers to, as the parties appear to have discussed a variety of investment opportunities. Additionally, as discussed supra, the only communication in the Complaint that remotely resembled a "guarantee" is in the email dated May 29, 2020, which does not appear to refer to any specific investment opportunity and, in fact, specifically excludes "3M transactions" like the Kaano Trading Company deal. (See ECF No. 1 ¶ 43 ("Just for your information, we are providing large quantities of PPE directly through our own manufacturers. Unlike 3M transactions, we guarantee production times, quality, and quantity.").)

Even if the Court were to accept that any of the above-referenced statements were materially false, Plaintiffs never draw any causal connection between Defendants' statements and Plaintiffs' losses from the failed Kaano Trading Company deal. As discussed above, the Complaint does not establish that any of Defendants' alleged misrepresentations referred to this

deal, which took place six months after all of the above-quoted representations, as opposed to any other investment opportunity.

The lack of a causal connection between Defendants' alleged misrepresentations and Plaintiffs' alleged injury is also fatal to Plaintiffs' argument that Defendants generally gave a false impression that they had relevant business experience. For example, Plaintiffs claim that it was a misrepresentation for Defendants to refer, in their June 8, 2020 email, to "our own inventory" because "Defendants did not have any of their 'own' inventory." (ECF No. 1 ¶ 20.) Plaintiffs also argue that it was fraudulent for Defendants to say, in their June 11, 2020 email, that they "normally aim to provide samples" because the word "normally" "materially misrepresent[ed] their experience for it to appear that the Defendants' experience included multiple successful transactions . . . when the true extent of his [sic] contacts were newly acquainted agents that he [sic] had never worked with previously." (Id.) These purported misrepresentations are extremely vague and Plaintiffs do not explain how they know that they were false or how they relate to the Kaano Trading Company. The June 11 email referred to a shipment of masks that was with a distributor in Las Vegas for which samples were unavailable. (See id.) The Kaano Trading Company deal concerned a seemingly different set of masks that shipped from Korea. (Id. ¶ 49.) The Complaint does not explain whether Plaintiffs decided to invest in the Las Vegas shipment, whether they were promised samples of any shipments that they considered investing in, or whether they sought samples of the masks they ultimately purchased from Kaano Trading Company. The Complaint likewise does not explain how references to Defendants' "own inventory" at all influenced their decision to purchase masks from a third party with no alleged relationship to the Defendants.

Finally, Plaintiffs argue that "Defendants specifically omitted the disclosing the perils of shipping in the targeted area such as 'corruption', 'payment obligations', 'counterfeit products,'"

in order to induce Plaintiffs to invest in PPE. (ECF No. 58-2 at 10–11 (quoting ECF No. 1 ¶ 14).) They claim it was fraudulent for Defendants not to disclose to Plaintiffs that they should conduct a risk analysis of the business idea. (ECF No. 1 ¶ 14.) However, to plead reasonable reliance on a material omission, "the party claiming fraud must at least have conducted 'minimal diligence' and not have been reckless." Cambridge Cap. LLC v. Ruby Has LLC, 675 F. Supp. 3d 363, 428–20 (S.D.N.Y. 2023) (quoting Banque Franco-Hellenique de Com. Int'l et Mar., S.A. v. Christophides, 106 F.3d 22, 27 (2d Cir. 1997)). Here, Plaintiffs have not plausibly alleged the existence of a "fiduciary or confidential relationship" that would impose a duty to disclose on Defendants. Dale, 2023 WL 3984345, at *7. The Complaint does not allege sufficient facts to conclude that Defendants' experience—purported or actual—made them more sophisticated than Plaintiff, an investor who maintains a business LLC and who, "among other things, invests money in business ventures," (ECF No. 1 ¶ 35), and informed Defendants that he had a "a preliminary or 'working' proficiency of legal shipping documents," (id. ¶ 52).[2] Additionally, the Complaint does not describe what diligence, if any, Plaintiffs performed before sending money to Kaano Trading Company. Indeed, they acknowledge that they were operating in a "climate of rampant PPE fraud," and appear to have been aware of that at the time, given their discussion Defendants about the difficulty of finding "verified" distributors. (See ECF No. 1 ¶ 43 ("We've communicated with a verified 3M distributor on 3M production stock. Unfortunately, the minimum order quantity through them is at least 10 million.").) Plaintiffs do not allege that Defendants prevented them from doing due diligence and do not provide the Court with any reason to conclude that minimal diligence on their part would have been insufficient to discover the risks involved in importing medical equipment from abroad at the height of the coronavirus pandemic. (See ECF No. 1 ¶ 14).

[2] Additionally, as explained further infra, Plaintiffs have not plausibly alleged the existence of a fiduciary relationship based on the fact that Defendants Sabih Siddiqi is a licensed attorney because the Complaint does not allege that Sabih Siddiqi provided Plaintiffs with legal advice of any kind.

For all these reasons, Counts 1 and 2 fail to meet Plaintiffs' pleading burden under Federal Rule of Civil Procedure 9(b), which requires that they "state with particularity the circumstances constituting [the] fraud." Fed. R. Civ. P. 9(b).

Plaintiffs' derivative claims for aiding and abetting the commission of a tort (Count 8) and conspiracy to commit fraud (Count 9) both depend on the existence of a viable underlying fraud claim. See, e.g., Dodona I, LLC v. Goldman Sachs & Co., 132 F. Supp. 3d 505, 512 (S.D.N.Y. 2015) (identifying the "existence of a fraud" as an element of aiding and abetting fraud); In re Tremont Sec. L., State L., & Ins. Litig., No. 08-cv-11117, 2013 WL 5393885, at *10 (S.D.N.Y. Sept. 26, 2013) (explaining that "civil conspiracy requires the commission of an independent actionable tort"). Accordingly, the Court dismisses the aiding and abetting and conspiracy claims along with Plaintiffs' fraud claims.

**D. Negligence Claims (Counts 5, 11)**

Plaintiffs' claim for negligent misrepresentation (Count 5) states, in a conclusory fashion, that "Defendants were aware that their statements to Plaintiff were to be used for a particular purpose by Plaintiffs," that Plaintiffs had "a relationship so close to Defendants as to approach that of privity," that Plaintiffs relied upon the Defendants on the statements [sic]," and that "Defendants engaged in conduct regarding the statement linking it to the Plaintiffs," and that "Defendants understood there is reliance upon the statement." (ECF No. 1 ¶¶ 88–94). Count 11 pleads alternative claims for negligence and for gross negligence, stating that Defendants breached an unidentified duty of care owed to Plaintiffs "by acting recklessly or negligently" through unspecified actions and that such acts caused reasonably foreseeable damages to the Plaintiffs. (ECF No. 1 ¶¶ 119–23.)[3]

[3] These allegations are nothing more than a conclusory recitation of the elements of these causes of action and are entirely unsupported by the factual allegations in the Complaint. Although the Court also dismisses these claims on other grounds, infra, the Court notes that the Complaint fails to state a claim under any of these causes of action because, as discussed above, there is no allegation that establishes a causal connection between Defendants' actions

Defendants argue that Plaintiffs' negligence claims are barred by the economic loss doctrine. (See ECF No. 58-1 at 17.) Under the economic loss doctrine, "a party to a contract that suffers economic loss only . . . is, in most cases, limited to recovery pursuant to a claim for breach of contract and cannot recover economic or consequential damages in tort." Corex, S.p.A. v. Cargo Compass S.p.A., No. 24-cv-3221, 2025 WL 3145896, at *6 (E.D.N.Y. Nov. 11, 2025) (quoting Avazpour Networking Servs., Inc. v. Falconstor Software, Inc., 937 F. Supp. 2d 355, 361 (E.D.N.Y. 2013)). Plaintiffs do not address this argument and, indeed, make no argument at all in their brief regarding their negligence and gross negligence claims. Accordingly, the Court concludes that they have forfeited these claims. See, e.g., Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp., 585 F. Supp. 3d 405, 423 (S.D.N.Y. 2022) ("At the motion to dismiss stage, a plaintiff abandons a claim by failing to respond to defendant's arguments in support of dismissing that claim."); Spinnato v. Unity of Omaha Life Ins. Co., 322 F. Supp. 3d 377, 405 (E.D.N.Y. 2018) (similar). Even if not abandoned, the Court agrees with Defendants that Plaintiffs' negligence claims are barred by the economic loss doctrine because the only injury they allege is the loss of their investment. See, e.g., Harris v. Pfizer Inc., 586 F. Supp. 3d 231, 243 (S.D.N.Y. 2022) ("Because the plaintiffs claim only economic harm, rather than personal injury, the economic loss doctrine bars their negligent misrepresentation claim."); Am. Fin. Int'l Grp.-Asia, L.L.C. v. Bennett, No. 05-cv-8988, 2007 WL 1732427, at *3 (S.D.N.Y. June 14, 2007) (dismissing plaintiffs' negligence claim based on the economic loss doctrine while also dismissing

---

and Plaintiffs' failed deal with Kaano Trading Company. See Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC, 680 F. Supp. 3d 322, 345 (S.D.N.Y. 2023) (listing the elements of negligent representation under New York Law, including that the plaintiff reasonably relied on defendant's false representations to his detriment and that the defendant "possess unique or specialized expertise"); Yuille v. Uphold HQ Inc., 686 F. Supp. 3d 323, 352 (S.D.N.Y. 2023) (explaining that a claim for gross negligence must allege that a defendant's conduct "evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing") (quoting Farash v. Cont'l Airlines, Inc., 574 F. Supp. 2d 356, 367–68 (S.D.N.Y. 2008)).

plaintiffs' breach-of-contract claim because no contract existed). Accordingly, the Court dismisses Plaintiffs' negligence claims.

**E. <u>Miscellaneous Claims (Counts 13, 14)</u>**

Count 13 alleges that Defendants are liable for breach of fiduciary duty because "Plaintiff discussed his needs and specifications for this project that necessarily involved legal advice and instruction from Defendant Sabih Siddiqi," who is an attorney, and because "[a]t no point did Defendant Sabih Siddiqi provide a written or verbal disclaimer that he did not intend to enter an attorney/client relationship" with Plaintiffs. (<u>See</u> ECF No. 1 ¶¶ 130–37.) This claim is utterly meritless, as the Complaint never alleges that Plaintiffs entered an attorney-client relationship of any kind with Siddiqi, sought or relied on his legal expertise, or ever discussed legal issues with him. The Complaint includes almost no information about the business relationship between Bagheri and Defendants and certainly does not provide any basis to infer that the parties had a relationship approaching privity. <u>See</u> <u>F.D.I.C. v. U.S. Mortg. Corp.</u>, 132 F. Supp. 3d 369, 388 (E.D.N.Y. 2015) (holding that no fiduciary relationship existed between parties where the defendant, who was an attorney, did not represent the plaintiff, "did not hold himself out as an expert on any relevant subject matter," and "did not render an opinion or written report upon which he intended [plaintiff] to rely"); <u>Petrello v. White</u>, 344 F. App'x 651, 653 (2d Cir. 2009) ("In New York, an attorney entering into a contractual relationship with another party does not automatically have a fiduciary duty towards that party; if the attorney is 'engaged in an arm's length business transaction,' he owes no such duty.") (quoting <u>Rooney v. Slomowitz</u>, 11 A.D.3d 864, 868 (N.Y. App. Div. 2004)).

Count 14 alleges that Defendants violated Sections 349 and 350 of New York's General Business Law. "Section 349 of the GBL provides a cause of action for any person injured by '[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing

or any service[,]'" and "Section 350 of the GBL prohibits '[f]alse advertising in the conduct of any business, trade or commerce[.]'" Chen v. Dunkin' Brands, Inc., 954 F.3d 492, 500 (2d Cir. 2020). "Under either provision, it is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer." Id. (internal quotation and citation omitted). "To state a claim under either Section, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" Colpitts v. Blue Diamond Growers, 527 F. Supp. 3d 562, 576 (S.D.N.Y. 2021) (quoting Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015)). Here, Plaintiffs have not alleged that Defendants engaged in any "consumer-oriented conduct," as the Complaint describes at most a one-off commercial transaction. Cf., e.g., Briggs v. Wells Fargo Bank, N.A., No. 14-cv-1759, 2015 WL 1014184, at *6 (E.D.N.Y. Mar. 6, 2015) (dismissing claim under § 349 because the conduct alleged involved no "acts against consumers in general" and concern a private dispute unique to [the] parties"). Further, for reasons discussed at length above, Plaintiffs fail to state a claim under the General Business Law because the Complaint does not allege sufficient facts to establish a causal connection between any misrepresentation by the Defendants and Plaintiffs' ill-fated decision to purchase masks from Kaano Trading Company.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is GRANTED. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: September 9, 2026
Central Islip, New York

/s/ JMA
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE